**Charlene JENKINS, And All Other Persons Similarly Situated, Plaintiffs,**

v.

**FIRST AMERICAN CASH ADVANCE OF GEORGIA, LLC, First Defendant,**

**First National Bank in Brookings, Second Defendant.**

**No. CIV.A.103–094.**

United States District Court, S.D. Georgia, Augusta Division.

Nov. 25, 2003.

Order Denying Reconsideration, Feb. 24, 2004.

John B. Long, Tucker, Everitt, Long, Brewton & Lanier, PC, Augusta, GA, James C. Overstreet, Jr., Scott J. Klosinski, PC, Augusta, GA, for Charlene Jenkins, And All Other Persons Similarly Situated, plaintiff.

John G. Parker, Paul, Hastings, Janofsky & Walker, LLP, Atlanta, GA, Harry D. Revell, Burnside, Wall, Daniel, Ellison & Revell, Augusta, GA, for First American Cash Advance of Georgia, LLC, First National Bank in Brookings, defendants.

## ORDER

BOWEN, Chief Judge.

Before the Court is Defendants' motion to stay and to compel arbitration in the captioned case. Plaintiff opposes arbitration as set forth in her somewhat tardy response to the motion.[1] For the following reasons, Defendants' motion is **DENIED.**

## I. BACKGROUND

Plaintiff represents a proposed class of individuals who entered into loan transactions with Defendants. Between June 7, 2002 and September 6, 2002, Plaintiff completed a series of eight loan transactions, each for less than $500 with Defendants. (Doc. No. 1, Ex. A.) A loan application for each transaction was completed at the offices of First American Cash Advance of Georgia ("First American"). Under the all encompassing terms of the loan documents, Plaintiff agreed to either arbitrate, or assert in a small claims tribunal, all claims against both First National Bank in Brookings ("First National Bank") and First American. (Doc. No. 4, Ex. C.) The arbitration agreements also requires Plaintiff to waive her right to serve

> as a representative, as a private attorney general, or in any other representative capacity, and/or to participate as a member of a class of claimants, in any lawsuit filed against us and/or related third parties.

(Doc. No. 4, Ex. D.) Plaintiff filed a putative class action suit, based on state law claims, in the Superior Court of Richmond County, Georgia. Defendants successfully removed the case to this Court. Defendants now seek to stay the court proceedings and compel arbitration pursuant to the terms of the arbitration agreement contained in each of the loan documents.

## II. ANALYSIS

Plaintiff signed and dated an Arbitration Agreement each time she took out a loan with Defendants. (Doc. No. 4, Ex. D.) The Federal Arbitration Act ("FAA") makes valid any written agreement to arbitrate a dispute arising out of a transaction involving interstate commerce. 9 U.S.C. § 4. Where a party to such an agreement fails or refuses to arbitrate, the

---

1. Under the Local Rules of this Court, the Court may deem the motion unopposed because of Plaintiff's untimely response. *See* L.R. 7.5, S.D. Ga. I will, however, address the merits of Defendants' motion notwithstanding the untimely opposition.

other party may move for an order compelling arbitration. *Id.* Furthermore, Section 4 of the FAA requires that the district court "must grant the motion if it is satisfied that the parties actually agreed to arbitrate the dispute." *Bess v. Check Express*, 294 F.3d 1298, 1304 (11th Cir.2002). However, if the making of the arbitration agreement is in issue, "the court must first adjudicate whether the agreement is enforceable against the parties." *Id.* Here, Plaintiff argues that the arbitration clause and agreement are unenforceable. Plaintiff contends first that the FAA does not apply to the underlying transaction, and second that the arbitration clause and agreement are unconscionable. The Court will address both of these arguments in turn.

## A. The Application of the FAA

█ Plaintiff contends the loan transactions do not involve interstate commerce, thus the FAA does not apply. For the FAA to apply, the transactions must fall within the definition of "involving commerce," as defined by 9 U.S.C. §§ 1 & 2. Section 1 of the FAA defines "commerce" as "commerce among the several states." 9 U.S.C. § 1. Section 2 of the FAA expounds on Section 1, providing:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Thus, the Court must determine if the transactions and loan documents satisfy 9 U.S.C. §§ 1, 2.

Plaintiff contends that she dealt exclusively with First American and that despite the loan agreement boilerplate language First National Bank was not the lender. Yet, First National Bank, a national bank located in South Dakota, is clearly listed on both the Promissory Note and the arbitration agreement as the lender (Doc. No. 4, Exs. C, D.) Furthermore, First National Bank set all the credit scoring criteria for the loans and approved or refused all applications. (Manning Aff. ¶ 6.) If the loan application was approved, First National Bank transmitted a preprinted "Consumer Loan Agreement" (*Id.* ¶ 8), which included an arbitration agreement signed by a representative of First National Bank. (Doc. No. 4, Ex. D.) The borrowers' checks are all made out to First National Bank and are also deposited in a bank account in First National Bank's name.

Plaintiff points to First American's ability to deposit the borrowers' checks in the bank account as proof that First American is the entity really controlling the loans. However, First American's ability to deposit checks in First National Bank's account does not show that First American is the lender. First National Bank's role in analyzing loan applications, sending the approved loan applications, funding the loans, and accepting the loan proceeds constitutes sufficient interstate commerce to satisfy the definition of "involving commerce" within the meaning of 9 U.S.C. §§ 1,2. *See Staples v. Money Tree Inc.*, 936 F.Supp. 856, 858 (M.D.Ala.1996).

## B. Unconscionability

█ The FAA makes valid any "written agreement to arbitrate a dispute aris-

ing out of a transaction involving interstate commerce, save upon such grounds as exist at law or in equity for the revocation of a contract." *Bess,* 294 F.3d at 1304. However, the state law must apply to contracts generally and not arbitrations specifically. *Id.* at 1306. Here, the Plaintiff contends that the arbitration clause and agreement are unenforceable because it is unconscionable. Since, this contention places in issue the enforceability of the arbitration agreement itself, it is an issue for this Court and not an arbitrator. *Id.*

 The court must determine whether the agreement is one that under the circumstances, "no sane man not acting under a delusion would make and no honest man would take advantage of." *NEC Technologies, Inc. v. Nelson,* 267 Ga. 390, 478 S.E.2d 769, 771 (1996). To determine if a contract or a contract clause qualifies as unconscionable under this concept, Georgia courts generally divide the relevant factors into procedural and substantive elements. *Id.* Procedural unconscionability addresses the process of making the arbitration agreement, while substantive unconscionability looks to the arbitration terms themselves. Some factors Georgia courts have considered "in determining whether a contract is procedurally unconscionable include the relative bargaining power of the parties, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice." *Id.* at 771–72.

The type of consumer loans that Defendants offer unquestionably places the consumer at a severe bargaining disadvantage. The rates of interest the lender charged, between approximately 438.00% and 938.57% annually, would only appeal to extremely desperate consumers. (Doc. No. 1, Ex. A.) Consumers who are willing to borrow money at such interest rates would foreseeably sign anything.

Furthermore, the arbitration clause in the contract and arbitration agreement are not the product of negotiation, but adhesion contracts. According to the affidavit of Robert Manning, General Counsel of First American, a customer fills out an application at the offices of First American, the application is then transmitted electronically to First National Bank, who then sends a completed consumer agreement and arbitration agreement back to First American for the consumer to sign. (Manning Aff. ¶ 7, 8.) There was no negotiation. According to Manning's affidavit, it appears the borrower was not even able to talk to the lender who determined the amount and conditions of the preprinted agreement. (*Id.* ¶ 11.) Thus, the arbitration agreement is procedurally oppressive because of the stark inequity of bargaining power.

In analyzing the substantive element of unconscionability, Georgia courts have focused on the breadth of the arbitration clause, "matters such as commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between parties, and similar public policy concerns." *NEC Technologies,* 478 S.E.2d at 772. Here, Plaintiff alleges the arbitration agreement lacks mutuality of obligation and is therefore unconscionable because "paragraph 6 of the agreement provides for a reservation to bring action in small claims tribunals for disputes within the scope of such tribunal's jurisdiction." (Pl. Brf. in Opp. to Mot. to Stay and Compel Arbitration at 1–2.) Plaintiff's contention is that the lender receives a benefit from the access to such tribunals, and that the borrower does not. (*Id.*)

It is hard to conceive of a claim by the payday lender that cannot be sought in a small claims tribunal. Yet, it is easy to envision a plethora of claims a consumer might seek which are inaccessible in a small claims tribunal due to its limited jurisdiction. Furthermore, the borrower's ability to pursue an action in a small claims court is illusionary. According to the terms of the loan documents, the judgments of the small claims court are appealable only to an arbitrator. If a consumer brought an action in a small claims tribunal, that consumer would only be delaying the inevitable arbitration. Thus, terms of the arbitration agreement greatly favor Defendants. I find the stipulation that provides access to a tribunal that will only benefit the lender extremely troublesome. While Georgia courts have decided that mere lack of mutuality of obligation alone does not render the arbitration provision unconscionable, *Saturna v. Bickley Const. Co.*, 252 Ga.App. 140, 555 S.E.2d 825, 827 (2001), and *Crawford v. Results Oriented, Inc.* 273 Ga. 884, 548 S.E.2d 342 (2001), in those cases the parties bargained for the contract. As shown above, in the present case the borrower had no bargaining power.

■ Public policy concerns also support a finding of unconscionability. In determining whether the terms of the arbitration agreement are unfair, such terms must be examined in the context of the circumstances existing at the time the agreement was made. *Gordon v. Crown Central Petroleum Corp.*, 423 F.Supp. 58, 61 (N.D.Ga.1976). Each arbitration clause was attached to a small loan of under $500. The arbitration agreement precludes the borrower from either instigating or participating in a class action suit. A class action is the only way that borrowers with claims as small as the individual loan transactions can obtain relief. *Leonard v. Terminix Intern. Co., L.P.*, 854 So.2d 529, 535 (Ala. 2002). The ability to pursue their grievances in small claims court as provided in the arbitration agreement is illusionary, as the lender can always appeal any judgment directly to arbitration. A borrower pursuing a claim individually based on one loan transaction against Defendants would probably be unable to procure a lawyer on a contingent fee basis, and instead would either have to face the battery of experienced defense lawyers alone or pay a lawyer by the hour. *Id.* In *Leonard,* the court reached the same conclusion as I do that the cost of attorney's fees is a significant factor in determining the arbitration agreement unconscionable. Here, prohibiting class action and requiring arbitration pursuant to an adhesion clause would have the practical effect of providing Defendants immunity. *Id.* at 536.

While there are numerous cases from the United States Supreme Court announcing a favorable disposition toward enforcing arbitration agreements, the Court has also repeatedly recognized the importance of class action relief. *Deposit Guaranty Nat'l Bank v. Roper,* 445 U.S. 326, 339, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980). If the arbitration agreement was the product of bargained-for terms, then the waiver of class action rights would be more palatable. However, the present arbitration agreement is an adhesion clause, does not possess mutuality of obligation, and is inaccessible because it precludes class action relief. When considered individually, these factors might not be enough to support a determination of unconscionability, but all three grossly unfavorable terms combined are more than sufficient.

After considering both the procedural and substantive elements of unconsciona-

bility, I conclude that enforcing the arbitration clause contained in the contracts and the arbitration agreement against the payday consumers would lead to an unjust result. Therefore, the arbitration agreement arising out of the contract that requires the parties to arbitrate is unconscionable and stricken from the contract as invalid. Defendants' motion to stay and compel arbitration is **DENIED**.

## III. CONCLUSION

For the forgoing reasons, Defendants' motion to stay and compel arbitration is **DENIED**.

## ORDER

Before this Court is Defendants' motion for reconsideration of this Court's Order dated November 25, 2003 (Doc. No. 22), or in the alternative to stay proceedings pending appeal. Upon consideration of the parties' briefs, I find no reason to change this Court's prior decision. Thus, Defendants' motion for reconsideration (Doc. No. 27) is **DENIED**. However, Defendants' motion to stay proceedings pending appeal is **GRANTED**.

### I. Motion for Reconsideration

In its November 25, 2003 Order, this Court denied Defendants' motion to stay and compel arbitration. After considering both the procedural and substantive elements of unconscionability, I concluded that enforcing the arbitration clause contained in the contracts and arbitration agreement would lead to an unjust result. Furthermore, consideration of the 200 years that consumer lenders have exploited legislative attempts to protect consumers confirms the need for close scrutiny. Christopher L. Peterson, *Truth, Understanding, and the High Cost Consumer Credit: The Historical Context or the Truth in Lending Act,* 55 Fla. L.Rev. 807, 853–54 (2003).

Most modern state usury laws derive from English interest rate cap statutes. During the end of the Eighteenth and throughout the nineteenth century, states sought to control the harmful consequences of high-cost lending by passing general usury laws establishing interest rate caps. *Id.* at 844. With very few exceptions, general usury laws were the only statutes regulating interest rates in the United States prior to the twentieth century. *Id.* But such laws provided little protection. Salary lenders, the precursors to modern payday lenders, regularly evaded these laws through techniques such as: 1) phrasing the contract as a purchase or assignment of future wages, rather than a loan; 2) taking advantage of the time-price doctrine; 3) offering the loan at a legal interest rate, but charging additional mandatory fees; 4) charging interest on money already repaid; 5) requiring the debtor to sign forms when taking out the loan that granted the lender power of attorney, and 6) confronting or threatening to confront a debtor's employer to force the debtor to seek a settlement. *Id.* at 852–55.

As the twentieth century began, one study estimated that one in five American workers owed money to a salary lender. *Id.* at 859. In 1907, another study showed that 90% of the employees in New York's largest transportation company made weekly payments to salary lenders. *Id.* In an effort to curtail the exorbitant interest rates offered by salary lenders, many states began to grant certain specialized lenders, banks, and other commercial creditors licenses to lend small amounts at rates in excess of a state's general interest rate cap. *Id.* at 862. In exchange the

licensed institutions agreed to bookkeeping, security interest and collection practice rules. These licensed exceptions to the general rate caps unsurprisingly became known as "special" usury statutes. *Id.* Despite these reforms, salary lenders were still the only option available to most low income families, who were deemed bad credit risks.

In the 1960s and 1970s, the federal government began to take a more active role in regulating consumer loans. In 1968, Congress passed the Truth in Lending Act ("TILA") which mandated disclosure of finance charges, required lenders to use uniform annual percentage rate (APR) terminology, and provided stiff penalties for disclosure violations. *Id.* at 814. The TILA of 1968 endured several small amendments to correct technical problems and to close regulatory loopholes in 1970, 1974, twice in 1976, and 1978; then in 1980, the Act received an extensive overhaul under the Truth in Lending Simplification Act. *Id.* at 888. Although the TILA was intended to allow consumers to shop for the best deal, today's disclosures are often too complex, come too late in the negotiations, and are still not accurate enough. *Id.*

Notwithstanding regulatory law reforms, payday lenders still employ variants of the same tactics to circumvent interest rate regulations. Payday lenders often exploit regulatory exceptions to the calculation of the finance disclosure charge and charge certain extra fees that are not included in the supposedly all encompassing finance disclosure charge. *Id.* at 901. These additional fees that are buried in the contracts are just the latest incarnation of an old tactic. Also, high-cost lenders often telephone first-time loan applicants' employers or human re-

source managers to verify that applicants are employed. *Id.* at 895. This employment verification almost always occurs before borrowers see a contract or any TILA disclosures. *Id.* While, admittedly, the practice helps evaluate the loan risk, it also increases search costs for first-time loans and encourages borrowers to use the very first lender in order to prevent future job jeopardizing calls. *Id.* at 897. This telephone verification is in many ways simply a new variant of the nineteenth century practice of confronting a borrower's employer to force an agreement.

In the past twenty-five years, high-cost lenders have also developed a new means of circumventing state consumer protection legislation; that is partnering with banks to avoid regulation. *Id.* at 810. The Supreme Court ruled in *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 318–19 n. 31, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978), that state interest rate caps are not applicable to federally chartered banks by virtue of the Supremacy Clause of the United States Constitution. Since that ruling, high cost consumer lenders have regularly teamed with obscure national banks to skirt state interest rate caps.

Unconscionable mandatory arbitration agreements contained in adhesion contracts offer another means for high-cost lenders to circumvent state laws. When the Federal Arbitration Act ("FAA") was enacted, bargaining was occurring primarily in the commercial context between business persons of equal bargaining power. Margaret M. Harding, *The Clash Between Federal and State Arbitration Law and the Appropriateness of Arbitration as a Dispute Resolution Process,* 77 Neb. L.Rev. 397, 400–01 (1998). Arbitration

agreements today are not limited to the same context. *Id.* at 401. It was probably not the intent of the original legislators that adhesion contracts which invoke the FAA enable stronger parties to force weaker parties into binding arbitration. Russell D. Feingold, *Mandatory Arbitration: What Process is Due?*, 39 Harv. J. on Legis. 281, 289 (2002). One troubling result of agreeing to arbitration is that whatever the rules of law may be, arbitrators are not bound to follow them and their handiwork is subject to only the most perfunctory judicial oversight. Charles L. Knapp, *Taking Contracts Private: The Quiet Revolution in Contract Law*, 71 Fordham L.Rev. 761, 782–83 (2002). After considering both the procedural and substantive elements of unconscionability, I concluded that enforcing the arbitration clause contained in the contracts and the arbitration agreement would lead to an unjust result. This determination has not changed. Thus, Defendants' motion for reconsideration is **DENIED**.

## II. Motion to Stay Proceedings

■■ In the event that the Court denied Defendants' motion to reconsider, Defendants also move that these proceedings be stayed pending appeal of the November 25, 2003 Order. Where a notice of appeal is filed, that "is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982). This has been interpreted to require a stay of all district court's proceedings, pending a non-frivolous appeal of an order denying a motion to compel arbitration. *Baron v. Best Buy Co., Inc.,* 79 F.Supp.2d 1350, 1353 (S.D.Fla.1999). De-

fendants' appeal is not frivolous since "there is some possible validity to it." *Baron,* 79 F.Supp.2d. at 1354. Furthermore, as the issue on appeal is whether this Court is the proper forum to resolve the parties claim, to proceed pending appeal might lead to unnecessary duplication. Thus, all matters in this case are **STAYED** until the Eleventh Circuit either (1) resolves the appeal by Defendants of the order denying their motion to compel arbitration or (2) dissolves the stay.

## II. Conclusion

Upon the foregoing, Defendants' motion for reconsideration is **DENIED** and Defendants' motion to stay pending appeal is **GRANTED**.