[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 18, 2005
THOMAS  K. KAHN
CLERK

_____

No. 03-16329

_____

D. C. Docket No. 03-00094 CV-1

CHARLENE JENKINS, And All Other
Persons Similarly Situated,

Plaintiff-Appellee,

versus

FIRST AMERICAN CASH ADVANCE
OF GEORGIA, LLC, FIRST NATIONAL
BANK IN BROOKINGS,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(February 18, 2005)**

Before ANDERSON, DUBINA and BLACK, Circuit Judges.

BLACK, Circuit Judge:

Plaintiff-Appellee Charlene Jenkins entered into several lending transactions with Defendants-Appellants First American Cash Advance of Georgia, LLC (First American) and First National Bank in Brookings (FNB). Each time Jenkins obtained a loan, she signed an Arbitration Agreement, in which she agreed to either arbitrate or assert in a small claims tribunal, any claim she had against Defendants. The Arbitration Agreements also required Jenkins to waive her right to participate in a class action against Defendants. Nonetheless, Jenkins filed a class action lawsuit against First American and FNB in state court, asserting the loan agreements violated Georgia usury laws. After removing the case to federal court, Defendants moved to stay the court proceedings and compel arbitration. The district court denied Defendants' motion, finding the Arbitration Agreements were unconscionable. Pursuant to 9 U.S.C. § 16(a) (2000), Defendants appealed the denial of their motion to this Court. We reverse and remand.

## I. BACKGROUND

FNB is a national bank chartered under the National Bank Act, 12 U.S.C. § 21–216(d) (2000), with its principal offices in South Dakota. From September 2001 through January 2003, First American, which is located in Georgia, managed and serviced loans for FNB; however, FNB set the credit scoring criteria for the

loans and funded the loans. Customers, like Jenkins, seeking to obtain a loan from FNB would fill out a loan application at First American's offices. First American would electronically transmit the application to FNB for review. FNB would analyze the loan application and make the final decision on whether or not to extend credit. If FNB approved the application, it would send a Consumer Loan Agreement, which included a Promissory Note and an Arbitration Agreement, to First American. To obtain the loan, the customer would have to sign and date both the Promissory Note and the Arbitration Agreement.

The type of lending transactions at issue in this case are commonly referred to as "payday loans." In general, payday loans are small-dollar, short-term loans with high interest rates. In such transactions, a borrower receives a modest cash advance that becomes due for repayment within a short period of time, usually about 14 days. As security for the loan, the borrower gives a check to the payday lender in the amount of the cash advance, plus the interest charged by the lender. The interest rates in payday lending transactions typically range from 20% to 30% for a two-week advance, which computes to an annual percentage rate of about 520% to 780%. If the borrower has not repaid the lender by the due date, the

lender can negotiate the check.[1]  Alternatively, the borrower may be able to extend

the loan's due date by paying a fee.  This type of extension is referred to as a

renewal or a rollover.

Between June 2002 and September 2002, Jenkins entered into at least eight

payday lending transactions with First American and FNB.  Each of these loans

was for less than $500 and had a maturity date between 7 and 14 days.  The annual

percentage rates charged by Defendants for these loans ranged from a low of

438% to a high of 938.57%.  Most of the loans in question charged an interest rate

of about 469% annually.

Like other FNB customers, Jenkins signed and dated a Promissory Note and

an Arbitration Agreement each time she took out a loan.  FNB was explicitly listed

as the lender in the loan documents, and First American was listed as the "loan

marketer/servicer."  Each Promissory Note included a choice-of-law provision,

stating the note was "governed by and construed in accordance with the laws of

South Dakota."  The Arbitration Agreements stipulated that they were governed

by the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1–16 (2000), because the

underlying lending transactions involved interstate commerce.  Each Arbitration

---

[1] Borrowers' repayment checks were made payable to FNB and were deposited in a bank account in FNB's name.

Agreement further stated if a court found the FAA did not apply to a particular transaction, then the Arbitration Agreement would be governed by the arbitration law of South Dakota.

The Arbitration Agreements signed by Jenkins provided that "all disputes" between the parties would be resolved by binding arbitration. They further stated Jenkins waived her right to participate in a class action against Defendants. Under the Agreements, Jenkins had the right to choose the arbitrator from a list of national arbitration organizations, or Jenkins and Defendants could agree on a local arbitrator. The Agreements required Defendants to advance Jenkins' arbitration costs if she submitted a written request for them to do so. The Arbitration Agreements also permitted the arbitrator to award reasonable attorneys' fees and expenses to the prevailing party "[i]f allowed by statute or applicable law."

The Arbitration Agreements provided only one exception to resolving disputes in arbitration: "All parties . . . shall retain the right to seek adjudication in a small claims tribunal for disputes within the scope of such tribunal's jurisdiction." The Agreements did, however, require appeals from the small claims tribunal to be resolved by arbitration. Therefore, by signing the Arbitration

5

Agreements, Jenkins agreed to resolve any claim she had against Defendants by either submitting the claim to arbitration or raising it in a small claims tribunal.

The main provisions of the Arbitration Agreements were conspicuously disclosed in bold-faced capital letters:

> You acknowledge and agree that by entering into this Arbitration Provision:
> (a) **YOU ARE WAIVING YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES;**
> (b) **YOU ARE WAIVING YOUR RIGHT TO HAVE A COURT, OTHER THAN A SMALL CLAIMS TRIBUNAL, RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES; and**
> (c) **YOU ARE WAIVING YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US AND/OR RELATED THIRD PARTIES.**[2]

In addition, each Promissory Note signed by Jenkins included a clause stating:

> **Arbitration**: You acknowledge that you have read, understand and agree to the terms contained in the Arbitration Agreement you are signing in connection with this Note. By entering into the Arbitration Agreement, you waive certain rights, including the right to go to

---

[2] The class action waiver was also conspicuously disclosed at another point in the Arbitration Agreements, where it was further explained: "**THE ARBITRATOR SHALL NOT CONDUCT CLASS ARBITRATION; THAT IS, THE ARBITRATOR SHALL NOT ALLOW YOU TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN THE ARBITRATION**."

court, to have the dispute heard by a jury (except as specifically provided in the Arbitration Agreement), and to participate as part of a class of claimants relating to any dispute with Lender, First American or their affiliates.

Jenkins nevertheless filed a class action lawsuit against First American and FNB in the Superior Court of Richmond County, Georgia. In her complaint, Jenkins alleged the payday loan agreements violate Georgia's usury statutes, Ga. Code Ann. §§ 7-4-2, 7-4-18 (2004), and the Georgia Racketeer Influenced and Corrupt Organizations (RICO) Act, Ga. Code Ann. § 16-14-4 (2003).

First American and FNB removed the case to federal district court. In federal court, First American and FNB sought to enforce the Arbitration Agreements signed by Jenkins. Defendants moved pursuant to the FAA to stay the court proceedings and to compel arbitration. Under the FAA, a written arbitration provision in "a contract evidencing a transaction involving [interstate] commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (2000). The FAA explains when a party to such an agreement fails or refuses to arbitrate, the other party may petition a federal district court for an order to compel arbitration. *Id.* § 4.

The district court found the payday lending transactions involved interstate commerce, and, therefore, the FAA applied. The district court, however, denied Defendants' motion to compel arbitration, finding the Arbitration Agreements were unenforceable because they were unconscionable. Defendants filed a motion to reconsider and to stay the proceedings pending this appeal. The district court denied the motion for reconsideration and granted the motion to stay the proceedings. This appeal followed.

## II. JURISDICTION AND STANDARD OF REVIEW

Pursuant to 9 U.S.C. § 16(a) (2000), we have jurisdiction over this appeal. 9 U.S.C. § 16(a) (2000) (authorizing an immediate appeal of any "final decision with respect to an arbitration").[3] We review de novo the district court's denial of a

---

[3] In her brief, Jenkins questions whether removal was appropriate in this case and suggests federal jurisdiction does not exist. This argument, however, is without merit. In *Beneficial National Bank v. Anderson*, 539 U.S. 1, 123 S. Ct. 2058 (2003), the United States Supreme Court held actions for usury against a national bank can be removed to federal court because the National Bank Act, 12 U.S.C. §§ 85–86 (2000), preempts state usury laws in such situations. *Id.* at 11, 123 S. Ct. at 2064. The Court explained:

> In actions against national banks for usury, [§§ 85 and 86] supercede both the substantive and the remedial provisions of state usury laws and create a federal remedy for overcharges that is exclusive, even when a state complainant, as here, relies entirely on state law. Because §§ 85 and 86 provide the exclusive cause of action for such claims, there is, in short, no such thing as a state-law claim of usury against a national bank.

*Id.*, 123 S. Ct. at 2064. Jenkins attempts to evade the Supreme Court's holding in *Anderson* by contending her usury claims were brought primarily against First American, not FNB. She argues FNB was only included in her complaint because she was seeking a declaratory judgment finding FNB to be a "sham" lender. Her complaint, however, expressly named both First American and FNB as Defendants and charged them both with usury. The complaint

8

motion to compel arbitration. *Musnick v. King Motor Co. of Fort Lauderdale*, 325 F.3d 1255, 1257 (11th Cir. 2003).

## III. DISCUSSION

The parties raise, *inter alia*, the following three issues on appeal: (1) whether the district court erred in applying the FAA to the loan agreements in this case; (2) whether the district court erred in finding the Arbitration Agreements are unconscionable; and (3) whether the Arbitration Agreements are unenforceable because the underlying payday loans are illegal and void *ab initio* under Georgia law. We address each of these issues in turn.

## A.     *Applicability of the FAA*

The purpose of the FAA "was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S. Ct. 1647, 1651 (1991). The FAA's provisions "manifest a 'liberal federal policy favoring arbitration agreements.'" *Id.* at 25, 111 S. Ct. at 1651

---

consistently used the plural form of "Defendants." She asserted that "Defendants violated" Georgia usury laws, and that she was "entitled to recover from Defendants all interest charges paid by [her]." Because Jenkins charged a national bank with violating Georgia usury laws, removal was proper.

9

(quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 941 (1983)).  The Supreme Court has "rejected generalized attacks on arbitration that rest on 'suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants.'" *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 89–90, 121 S. Ct. 513, 521 (2000) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 481, 109 S. Ct. 1917, 1920 (1989)).

The FAA makes enforceable a written arbitration provision in "a contract evidencing a transaction involving commerce."  9 U.S.C. § 2 (2000).   The FAA defines "commerce" as "commerce among the several States."  *Id.* § 1.  The Supreme Court has "interpreted the term 'involving commerce' in the FAA as the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power."  *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56, 123 S. Ct. 2037, 2040 (2003) (citation omitted).  The Court has further explained the phrase "evidencing a transaction" means only that the transaction turns out, in fact, to have involved interstate commerce, "even if the parties did not contemplate an interstate commerce connection."  *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 277–81, 115 S. Ct. 834, 841–43 (1995).

10

In this case, the district court found the FAA applied because the underlying payday lending transactions involved interstate commerce. On appeal, Jenkins challenges this part of the district court's decision, contending there has been no showing that the loan agreements involved interstate commerce. Jenkins' contention is without merit.

The FAA's broad interstate commerce requirement is satisfied in this case. The lending transactions were between Jenkins, a Georgia resident, and FNB, a national bank located in South Dakota.[4] Loan applications were electronically transmitted to South Dakota, where FNB decided whether to approve or refuse the loans. If the loans were approved, FNB sent the borrowers preprinted Consumer Loan Agreements, each including an Arbitration Agreement. The district court explained: "First National Bank's role in analyzing loan applications, sending the approved loan applications, funding the loans, and accepting the loan proceeds constitutes sufficient interstate commerce to satisfy the definition of 'involving commerce' within the meaning of 9 U.S.C. §§ 1, 2." *Jenkins v. First Am. Cash*

---

[4] The district court correctly rejected Jenkins' assertion that First American, a Georgia entity, was the "true" lender. FNB was expressly listed as the lender in the loan documents, while First American was listed merely as the "loan marketer/servicer." FNB approved the loans, funded the loans, and set the credit scoring criteria for the loans. Also, repayment checks were made out to FNB and deposited in a bank account in FNB's name.

11

*Advance of Georgia*, 313 F. Supp. 2d 1370, 1373 (S.D. Ga. 2003) (citation omitted).

We agree with the district court. Here, the parties not only contemplated an interstate commerce connection when they entered into the lending agreements,[5] but the payday lending transactions did, in fact, turn out to involve interstate commerce. The district court did not err in applying the FAA to the loan agreements signed by Jenkins.[6]

B.      *Unconscionability*

Under the FAA, a written arbitration provision is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of *any* contract." 9 U.S.C. § 2 (2000) (emphasis added). This language has been interpreted to mean "[t]he FAA allows state law to invalidate an arbitration agreement, provided the law at issue governs contracts generally and not arbitration agreements specifically." *Bess v. Check Express*, 294 F.3d 1298, 1306

---

[5] The Arbitration Agreements expressly stipulated the lending transactions between Jenkins and Defendants involved interstate commerce and were governed by the FAA.

[6] We also reject Jenkins' argument that the FAA does not apply because the Georgia legislature recently made a general pronouncement that payday lending does not involve interstate commerce. *See* Ga. Code Ann. § 16-17-1(d) (2003 & Supp. 2004) (effective May 2004). Courts determine whether or not interstate commerce exists under the FAA on a case-by-case analysis by examining whether the transaction in question turns out, in fact, to have involved interstate commerce. *See Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 277–81, 115 S. Ct. 834, 841–43 (1995).

12

(11th Cir. 2002) (citing *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686,

116 S. Ct. 1652, 1656 (1996)).  The Supreme Court has recognized that "generally

applicable contract defenses, such as fraud, duress, or unconscionability, may be

applied to invalidate arbitration agreements."  *Doctors Assocs.*, 517 U.S. at 687,

116 S. Ct. at 1656.  In this case, Appellant argues, and the district court found, the

Arbitration Agreements signed by Jenkins are unconscionable.

In deciding claims of unconscionability, Georgia courts generally consider a

variety of factors, which have been divided into procedural and substantive

elements.[7]  *NEC Techs., Inc. v. Nelson*, 478 S.E.2d 769, 771–72 (Ga. 1996).

"Procedural unconscionability addresses the process of making the contract, while

substantive unconscionability looks to the contractual terms themselves."  *Id.* at

771.  Factors relevant to the procedural unconscionability inquiry include the

bargaining power of the parties, "the conspicuousness and comprehensibility of

the contract language, the oppressiveness of the terms, and the presence or

---

[7] In determining whether the Arbitration Agreements were unconscionable, the district court applied Georgia unconscionability law.  The choice-of-law provisions in the Arbitration Agreements stipulated that the FAA governs those Agreements, and that if a court found the FAA did not apply to a particular transaction, then South Dakota *arbitration* law would govern. Moreover, the choice-of-law provisions within the Promissory Notes provided that those Notes would be controlled by the laws of South Dakota.  As South Dakota's unconscionability laws mirror Georgia's laws, the outcome of the unconscionability issue would be the same regardless of which state law applied.  *See Johnson v. John Deere Co.*, 306 N.W.2d 231, 237–38 (S.D. 1981) (applying the same two-part analysis of procedural and substantive unconscionability).

absence of a meaningful choice." *Id.* (citations omitted). As for substantive unconscionability, courts consider "the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Id.* at 772 (citations omitted).

On the procedural side of this analysis, the district court found that Defendants had superior bargaining power and that the Arbitration Agreements constituted adhesion contracts. On the substantive side of the analysis, the court provided two reasons for finding the terms of the Agreements to be unconscionable: (1) precluding class action relief was unfair because a class action is the most effective method for borrowers with small claims to obtain relief; and (2) the Arbitration Agreements lacked mutuality of obligation because the provision providing access to a small claims tribunal would only benefit the lender, FNB.

The district court explained that considered individually, these factors might not be enough to support a finding of unconscionability, but that considered together, they rendered the Arbitration Agreements unconscionable. We disagree.

1. *Bargaining Power/Adhesion*

The district court found the Arbitration Agreements were "procedurally oppressive" because the "type of consumer loans that Defendants offer

14

unquestionably places the consumer at a severe bargaining disadvantage."

*Jenkins*, 313 F. Supp. 2d at 1374. The court stated "[c]onsumers who are willing to borrow money at such [high] interest rates would foreseeably sign anything." *Id.* The court further explained consumers were unable to negotiate the terms of the preprinted contracts. After a customer, like Jenkins, filled out a loan application at First American's offices, the application would be electronically transmitted to FNB. FNB would then send a completed Consumer Loan Agreement, including an Arbitration Agreement, back to First American for the borrower to sign. The court found the contracts to be adhesive because the borrower was unable to discuss or negotiate "the amount and conditions of the preprinted agreement." *Id.*

Before considering the merits of the adhesion argument, we must first decide whether this issue is one for an arbitrator or a court to resolve. The FAA "provides a remedy to a party seeking to compel compliance with an arbitration agreement." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403, 87 S. Ct. 1801, 1806 (1967). Such a party can move the district court for an order compelling arbitration. 9 U.S.C. § 4 (2000). Section four of the FAA instructs the federal court to grant the motion and order arbitration once it is satisfied "that the making of the agreement for arbitration . . . is not in issue." *Id.* If, however, the

15

making of the arbitration agreement is in question, then the federal court may first adjudicate that issue. *Id.*

In interpreting this section of the FAA, the Supreme Court has distinguished between claims that challenge the contract generally and claims that challenge the arbitration provision itself. *See Prima Paint Corp.*, 388 U.S. at 403–04, 87 S. Ct. at 1806. In *Prima Paint*, the plaintiff sought to rescind a contract on the grounds that the contract was fraudulently induced. *Id.* at 398, 87 S. Ct. at 1803. The defendant, on the other hand, sought to invoke the contract's arbitration clause and moved to stay the action pending arbitration. *Id.* at 398–99, 87 S. Ct. at 1803. The Supreme Court explained:

> [I]f the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the "making" of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language [of the FAA] does not permit the federal court to consider claims of fraud in the inducement of the contract generally.

*Id.* at 403–04, 87 S. Ct. at 1806. The Court concluded that because the fraudulent inducement claim related to the underlying contract generally, and not to the arbitration clause specifically, it was a matter to be resolved by the arbitrator, not the federal court. *Id.* at 406, 87 S. Ct. at 1807.

This Court has applied the *Prima Paint* rule to claims of adhesion and unconscionability. We have held that "[i]f . . . [the party's] claims of adhesion,

16

unconscionability, . . . and lack of mutuality of obligation pertain to the contract as a whole, and not to the arbitration provision alone, then these issues should be resolved in arbitration." *Benoay v. Prudential-Bache Secs., Inc.*, 805 F.2d 1437, 1441 (11th Cir. 1986) (citations omitted).

Here, the adhesion arguments relied on by the district court pertain to the underlying Consumer Loan Agreements as a whole, and not to the Arbitration Agreements specifically. As explained above, the adhesion arguments were (1) that the consumers lacked bargaining power because these "type[s] of consumer loans . . . would only appeal to extremely desperate consumers," and (2) that the consumers were allegedly unable to negotiate the terms and conditions of the preprinted agreements. *Jenkins*, 313 F. Supp. 2d at 1374. These claims do not relate to the Arbitration Agreements themselves; rather, they allege the Consumer Loan Agreements, in general, were adhesive. Under the Supreme Court's decision in *Prima Paint* and our decision in *Benoay*, the FAA does not permit a federal court to consider claims alleging the contract as a whole was adhesive. We conclude, therefore, Jenkins' adhesion claims are for an arbitrator, not a federal court, to decide.

## 2. *Class Action Waiver*

The district court found the Arbitration Agreements were substantively unconscionable because they preclude "borrower[s] from either instigating or participating in a class action suit." *Jenkins*, 313 F. Supp. 2d at 1375. The court explained "[a] class action is the only way that borrowers with claims as small as the individual loan transactions [at issue in this case] can obtain relief." *Id.* The district court considered the cost of attorney's fees to be a significant factor in determining whether the Arbitration Agreements are unconscionable. *Id.* The court speculated that a borrower who attempts to pursue her claim individually based on one loan transaction would "probably" be unable to obtain a lawyer on a contingent fee basis. *Id.* The district court found requiring arbitration and prohibiting class action "would have the practical effect of providing Defendants immunity." *Id.*

As an initial matter, we note this issue may be decided by a federal court. The class action waiver was a provision included in each of the Arbitration Agreements. Unlike the adhesion argument, which applies to the loan contracts generally, this claim alleges the Arbitration Agreements specifically are unconscionable because they preclude class action relief. Under section four of the FAA, a federal court may adjudicate this claim because it applies to the

18

Arbitration Agreements themselves, and thus, it places the making of the Arbitration Agreements in issue. *See* 9 U.S.C. § 4 (2000).

We have held, however, that arbitration agreements precluding class action relief are valid and enforceable. *See Randolph v. Green Tree Fin. Corp.-Alabama*, 244 F.3d 814, 819 (11th Cir. 2001) (holding "a contractual provision to arbitrate TILA claims is enforceable even if it precludes a plaintiff from utilizing class action procedures in vindicating statutory rights under TILA"). Other federal circuit courts have similarly enforced arbitration agreements despite the fact that classwide relief was unavailable. *See, e.g.*, *Snowden v. Checkpoint Check Cashing*, 290 F.3d 631, 638 (4th Cir. 2002) (rejecting the borrower's argument "that the Arbitration Agreement is unenforceable as unconscionable because without the class action vehicle, she will be unable to maintain her legal representation given the small amount of her individual damages"); *Johnson v. West Suburban Bank*, 225 F.3d 366, 369 (3d Cir. 2000) (holding arbitration "clauses are effective even though they may render class actions to pursue statutory claims under the TILA or the EFTA unavailable"); *cf. Livingston v. Assocs. Fin., Inc.*, 339 F.3d 553, 559 (7th Cir. 2003) ("The Arbitration Agreement at issue here explicitly precludes the [borrowers] from bringing class claims or pursuing 'class action arbitration,' so we are therefore 'obliged to enforce the type

19

of arbitration to which these parties agreed, which does not include arbitration on a class basis.'") (citations omitted).

In addition, the district court's contention that consumers would likely be unable to obtain legal representation without the class action vehicle is unfounded. The Arbitration Agreements expressly permit Jenkins and other consumers to recover attorneys' fees and expenses "[i]f allowed by statute or applicable law." Under the Georgia RICO statute, a prevailing plaintiff may be awarded attorney's fees. Ga. Code Ann. § 16-14-6(c). Jenkins, therefore, can presumably recover attorneys' fees and costs if she prevails in arbitration on her Georgia RICO claim.[8] *See Snowden*, 290 F.3d at 638 (in rejecting an unconscionability argument, the court concluded the plaintiff could recover attorney fees in arbitration if she prevailed on her TILA and civil RICO claims).

Georgia courts have explained that by authorizing the recovery of attorneys' fees, the Georgia RICO statute provides plaintiffs "with effective access to the judicial process." *Dee v. Sweet*, 489 S.E.2d 823, 825 (Ga. 1997). Moreover, federal circuit courts have recognized that arbitration agreements prohibiting class action relief do not "necessarily choke off the supply of lawyers willing to pursue

---

[8] Also, Jenkins' arbitration costs would not be expensive. Under the Arbitration Agreements, Defendants have offered to advance Jenkins' arbitration expenses, such as filing and administrative fees, if she submits a written request.

claims on behalf of debtors." *Johnson*, 225 F.3d at 374; *see also Snowden*, 290 F.3d at 638. These courts explained that when the opportunity to recover attorneys' fees is available, lawyers will be willing to represent such debtors in arbitration. *See Snowden*, 290 F.3d at 638; *Johnson*, 225 F.3d at 374.

Thus, precluding class action relief will not have the practical effect of immunizing First American and FNB. The Arbitration Agreements permit Jenkins and other consumers to vindicate all of their substantive rights in arbitration. We conclude, therefore, the inclusion of a class action waiver in the Arbitration Agreements did not render those Agreements substantively unconscionable.

3.    *Access to Small Claims Tribunals*

The district court's finding of substantive unconscionability was also based on the provision in the Arbitration Agreements permitting either party to seek adjudication in a small claims tribunal. The court found the Arbitration Agreements lacked mutuality of obligation because this provision only benefits Defendants.

On its face, this provision does not favor one party over the other; rather, it provides that "[a]ll parties . . . shall retain the right to seek adjudication in a small claims tribunal for disputes within the scope of such tribunal's jurisdiction." The district court, however, found a borrower's ability to pursue an action in a small

claims tribunal to be illusory. The court speculated that it is "hard to conceive of a claim by the payday lender that cannot be sought in a small claims tribunal," but it is "easy to envision a plethora of claims a consumer might seek which are inaccessible in [such a tribunal] due to its limited jurisdiction." *Jenkins*, 313 F. Supp. 2d at 1375. Additionally, the district court explained this provision favored Defendants because the judgments of small claims tribunals were appealable to an arbitrator.[9]

Under Georgia law, if at the time the agreement is to be enforced, "the contract contains mutual obligations equally binding on both parties to the contract, then the contract is not unilateral and unenforceable." *Jones v. Quigley*, 315 S.E.2d 59, 60 (Ga. Ct. App. 1984). In this case, both Jenkins and Defendants had equal access to small claims tribunals. The only restriction, which applied equally to both parties, was that the claims sought in such a tribunal must fall within the tribunal's limited jurisdiction.

In stating it could "envision a plethora of claims" that consumers would not be able to raise in small claims courts, the district court apparently overlooked the many claims that consumers *could* bring in such tribunals. For example, if FNB

---

[9] We note this claim alleged the Arbitration Agreements themselves were unconscionable due to a lack of mutuality of obligation; therefore, the district court had the authority, under the FAA, to adjudicate the issue. *See* 9 U.S.C. § 4 (2000).

charged a consumer an interest rate higher than that agreed upon in the contract, the consumer could, in most instances, pursue an action for the difference in a small claims court. Additionally, if FNB mistakenly imposed late charges on a consumer, he could presumably seek recovery in a small claims tribunal. Thus, we disagree with the district court's unsupported speculation that the consumers' ability to pursue an action in a small claims tribunal is illusory.

We note, moreover, that the provision providing access to small claims tribunals was intended to benefit, not injure, consumers. The American Arbitration Association (AAA) has developed a set of principles, known as the Consumer Due Process Protocol, to protect consumers and ensure they are treated equitably in arbitration. *See generally* American Arbitration Association, Consumer Due Process Protocol, (Apr. 17, 1998), http://www.adr.org/protocols. Principle 5 of this Protocol expressly states that consumer arbitration agreements, like those at issue here, should offer all parties the option of seeking adjudication in a small claims tribunal. *Id.* The Comment to Principle 5 explains "access to small claims tribunals is an important right of Consumers" because it provides "a convenient, less formal, and relatively expeditious judicial forum for handling . . . disputes" involving small amounts of money. *Id.* By including a provision that offers access to such tribunals, the Arbitration Agreements at issue here merely

23

complied with the AAA's Consumer Due Process Protocol. Such compliance further undermines the district court's finding that the small-claims provision in the Arbitration Agreements only benefitted the payday lender. *Cf. Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 94–95, 121 S. Ct. 513, 524 (2000) (Ginsburg, J., concurring) (explaining the drafter of the contract could have relied on the AAA's Consumer Arbitration Rules to ensure the claims are arbitrated under a "consumer-protective fee arrangement").

We further note the district court did not provide support for its assertion that the small-claims provision favors Defendants because the judgments from small claims courts are appealable to an arbitrator. This aspect of the small-claims provision is equally binding on Jenkins and Defendants, as both parties are obligated to appeal such judgments to an arbitrator. Moreover, the arbitral forum does not unfairly favor Defendants. Jenkins, who has raised claims under Georgia usury laws and the Georgia RICO statute, is capable of vindicating all of her substantive rights in arbitration. In *Bess v. Check Express*, 294 F.3d 1298 (11th Cir. 2002), we held the terms of the arbitration agreement at issue in that case did not "grossly favor" the payday lender because, among other reasons, "nothing in the agreement prevent[ed] the arbitrator from awarding 'the full panoply of relief' available under [the applicable] law." *Id.* at 1308; *see also Green Tree Fin. Corp.*,

531 U.S. at 90, 121 S. Ct. at 521 (holding "even claims arising under a statute designed to further important social policies may be arbitrated because so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute serves its functions") (alteration in original) (citation and internal quotation marks omitted). The same is true in this case, as the Arbitration Agreements do not limit Jenkins' right to relief.[10]

We conclude the small-claims provision is mutual and bilateral—it applies equally to both parties. Jenkins has not demonstrated that access to small claims tribunals unfairly benefits Defendants. The Arbitration Agreements, therefore, do not lack mutuality of obligation.

In summary, we disagree with the district court's reasons for finding the Arbitration Agreements unconscionable. The district court did not have the authority to decide the adhesion claim because that issue related to the loan agreements generally and, therefore, should have been submitted to an arbitrator. Although the district court did have the authority to adjudicate the arguments relating to the class action waiver and the small-claims provision, those

---

[10] We note the Arbitration Agreements also permit Jenkins to either (1) choose the arbitrator from a list of national arbitration organizations, or (2) come to an agreement with Defendants in selecting a local arbitrator.

contractual conditions, for the reasons explained above, did not render the Arbitration Agreements unconscionable.

C.      *Legality of the Underlying Transactions*

Jenkins raises an alternative argument for affirming the denial of Defendants' motion to compel arbitration. Jenkins argues Defendants' motion should not be granted because the underlying payday loan contracts are illegal and void *ab initio* under Georgia law. *See* Ga. Code Ann. § 16-17-1 (2003 & Supp. 2004) (effective May 2004). Because the loan contracts are allegedly void, Jenkins contends "there is nothing to arbitrate."

We have, however, previously considered and rejected such an argument. *Bess*, 294 F.3d at 1304–06. In *Bess*, a class action lawsuit arose out of "check advances" or "deferred payment transactions" between the plaintiffs and defendants. *Id.* at 1300. A deferred payment transaction is essentially the same as a payday lending transaction. *See id.* at 1300–01. One of the named plaintiffs in *Bess*, Luna Clifton Colburn, signed an arbitration agreement in connection with the deferred payment transactions. The defendants sought to enforce this agreement and compel arbitration. Like Jenkins' argument in this case, Colburn argued the arbitration agreements were unenforceable because the underlying deferred payment transactions were void as illegal under Alabama law. Colburn

26

alleged the loans charged usurious rates of interest, and the collection of the loans violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961–1968 (2000).

In rejecting Colburn's argument, we applied the *Prima Paint* rule. *Bess*, 294 F.3d at 1304–05. We explained the "allegations of illegality go to the deferred payment transactions generally, and not to the arbitration agreements specifically." *Id.* at 1305. Therefore, an arbitrator, and not a federal court, should determine whether the underlying transactions are illegal and void. *Id.* at 1306.

In *Bess*, we also distinguished our holding from our earlier decision in *Chastain v. Robinson-Humphrey Co., Inc.*, 957 F.2d 851 (11th Cir. 1992).[11] In *Chastain*, we considered an "unusual" set of facts, in which the plaintiff never personally signed the customer agreements at issue. *Id.* at 852–53. Without such a signature, the plaintiff argued she never assented to the arbitration clauses found within the customer agreements. *Id.* at 853. We explained:

> Under normal circumstances, an arbitration provision within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration. Under such circumstances, the parties have at least presumptively

---

[11] Jenkins' argument relies on a Georgia case, *Stewart v. Favors*, 590 S.E.2d 186 (Ga. Ct. App. 2003), and a Florida case, *Cardegna v. Buckeye Check Cashing, Inc.*, — So. 2d — (Fla. 2005), both of which cite this Court's decision in *Chastain*.

agreed to arbitrate any disputes, including those disputes about the validity of the contract *in general*.

*Id.* at 854 (citations omitted). "Where the party seeking to avoid arbitration admittedly did not sign any contract requiring arbitration, however, 'there is no presumptively valid general contract which would trigger the district court's duty to compel arbitration pursuant to the [FAA].'" *Bess*, 294 F.3d at 1305 (quoting *Chastain*, 957 F.2d at 854) (alteration in original).

In *Chastain*, the plaintiff alleged "that a contract *never existed at all*" because she never signed and assented to the contracts in question. 957 F.2d at 855. She challenged "the very existence of *any* agreement, *including the existence of an agreement to arbitrate*." *Id.* at 854. In that situation, we held the plaintiff placed the making of the arbitration agreement in question, thereby permitting the district court to adjudicate the issue. *Id.* at 855. We concluded that before determining whether arbitration should be compelled under the FAA, the district court can decide whether the parties assented to the contracts containing the arbitration clauses. *Id.* at 855–56; *see also Bess*, 294 F.3d at 1305.

The plaintiff in *Bess*, Colburn, attempted to compare his void *ab initio* allegation to the contentions in *Chastain* that a contract never existed. 294 F.3d at 1305. We rejected this argument, explaining Colburn's reliance on *Chastain* was

28

misplaced because *Chastain* focused primarily "on the question of assent." *Id.*

We explained:

> Colburn urges that the transactions in this case are void, not because he failed to assent to the essential terms of the contracts, but because those terms allegedly render the contracts illegal under Alabama law. At bottom, Colburn challenges the *content* of the contracts, not their *existence*. Indeed, unlike the contracts in *Chastain*, both the arbitration agreement and the deferred payment contracts were signed by Colburn, and there is no question about Colburn's assent to those contracts. Thus, this case falls within the "normal circumstances" described in *Chastain*, where the parties have signed a presumptively valid agreement to arbitrate any disputes, including those about the validity of the underlying transaction.

*Id.* at 1305–06. Because assent to the contracts was not in question, we applied

*Prima Paint* and held that whether or not the deferred payment transactions were

usurious and void was an issue to be decided by an arbitrator, not a federal court.

*Id.* at 1306; *see also John B. Goodman Ltd. P'ship v. THF Constr.*, 321 F.3d 1094

(11th Cir. 2003) (holding whether or not the underlying construction contracts

were unenforceable under Florida law was a question for the arbitrator to

decide).[12]

---

[12] Other federal circuit courts have similarly held that allegations claiming high interest loan agreements are void as illegal will not preclude the enforcement of arbitration provisions included in the allegedly illegal contracts. *See, e.g.*, *Snowden v. Checkpoint Check Cashing*, 290 F.3d 631, 637 (4th Cir. 2002) ("[Plaintiff's] allegations of usurious rates of interest . . . do not relate specifically to the Arbitration Agreement. Neither do they underlie a claim that [Plaintiff] failed to assent to the terms of the . . . Agreement."); *Burden v. Check Into Cash of Kentucky, LLC*, 267 F.3d 483, 489–91 (6th Cir. 2001) (holding plaintiffs' allegations that the high interest loan agreements were void as illegal was an issue to be decided by an arbitrator).

Jenkins' void *ab initio* argument is no different from the argument we dismissed in *Bess*. Jenkins assented to the payday loan contracts and the Arbitration Agreements associated with those contracts. It is undisputed that she signed and dated both a Promissory Note and an Arbitration Agreement each time she obtained a loan from FNB. Jenkins argues the payday loan contracts are void, not because she failed to assent to the terms of the contracts, but because those terms render the contracts usurious and void under Georgia law. Thus, Jenkins does not challenge the existence of either the payday loan contracts or the accompanying Arbitration Agreements; rather she challenges the content of the contracts—i.e., the rates of interest charged in the loan agreements. As we held in *Bess*, we conclude Jenkins and Defendants entered into "presumptively valid agreement[s] to arbitrate any disputes, including those about the validity of the underlying transaction." *Bess*, 294 F.3d at 1306; *see also John B. Goodman Ltd. P'ship*, 321 F.3d at 1096. We conclude, therefore, that Jenkins' void *ab initio* argument, which challenges the legality of the payday lending transactions, is an issue for the arbitrator, not the court, to decide.[13]

---

[13] We note this issue raised a question of federal law—namely, deciding whether the district court has the authority under the FAA to adjudicate Jenkins' claim that the payday lending transactions were illegal. *See Bess*, 294 F.3d at 1306 n.3. In deciding this federal question, we do not pass judgment on any issues of Georgia contract law. *See id.*

## IV.  CONCLUSION

For the reasons stated above, we conclude the district court erred in finding the Arbitration Agreements at issue in this case unconscionable and unenforceable.  Moreover, Jenkins' alternative argument for affirming the district court—alleging the underlying payday lending transactions are void *ab initio* under Georgia law—is an issue for an arbitrator, not the court, to decide.  Accordingly, we reverse the district court's decision and remand with instructions to grant Defendants' motion to compel arbitration.

REVERSED and REMANDED.